**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>     Plaintiff,<br><br>     v.<br><br>CAREER EDUCATION CORPORATION, a corporation,<br><br>AMERICAN INTERCONTINENTAL UNIVERSITY, INC., a corporation,<br><br>AIU ONLINE, LLC, a limited liability company,<br><br>MARLIN ACQUISITION CORP., a corporation,<br><br>COLORADO TECH., INC., a corporation,<br><br>and<br><br>COLORADO TECHNICAL UNIVERSITY, INC., a corporation,<br><br>     Defendants. | **Case No.**   19-cv-5739<br><br><br><br><br><br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), pursuant to Section 16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 56(a)(1), for its complaint alleges:

1

1.     Plaintiff brings this action under Sections 5(a), 5(m)(1)(A), 13(b), 16(a), and 19 of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), 56(a), and 57b, and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), 15 U.S.C. § 6105, to obtain monetary civil penalties, a permanent injunction, and other relief for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Telemarketing Sales Rule (the "TSR" or "Rule"), as amended, 16 C.F.R. Part 310.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.  This action arises under 15 U.S.C. § 45(a), 45(m)(1)(A), 53(b), 56(a), and 57b, and 15 U.S.C. § 6105.

3.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), 1391(c)(1), 1391(c)(2) and 1395(a), and 15 U.S.C. § 53(b). Defendants reside in or transact business in this District.

## DEFENDANTS

4.     Defendant Career Education Corporation is a Delaware corporation with its principal place of business at 231 N. Martingale Road, Schaumburg, Illinois.  Career Education Corporation transacts or has transacted business in this district and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, Career Education Corporation has advertised, marketed, distributed, or sold

2

educational products and services to consumers throughout the United States. At all times material to this complaint, with respect to the acts and practices of American InterContinental University, Inc., AIU Online, LLC; Marlin Acquisition Corp., Colorado Technical University, Inc., and Colorado Tech, Inc., that are described below, Career Education Corporation dominated or controlled those acts and practices, knew or approved of those acts and practices, and/or benefitted from those acts and practices.

5.    Defendant American InterContinental University, Inc. ("AIU") is a Georgia corporation and wholly owned subsidiary of Career Education Corporation with its principal place of business at 231 N. Martingale Road, Schaumburg, Illinois. At all times material to this Complaint, acting alone or in concert with others, AIU has advertised, marketed, distributed, or sold educational products and services to consumers throughout the United States.

6.    Defendant AIU Online, LLC ("AIU Online") is a Delaware corporation and wholly owned subsidiary of AIU with its principal place of business at 231 N. Martingale Road, Schaumburg, Illinois. At times material to this Complaint, acting alone or in concert with others, AIU Online has advertised, marketed, distributed, or sold educational products and services to consumers throughout the United States.

7.    Defendant Marlin Acquisition Corp. ("Marlin") is a Florida corporation and wholly owned subsidiary of Career Education Corporation with its principal place of business at 231 N. Martingale Road, Schaumburg, Illinois. At all times material to this

Complaint, acting alone or in concert with others, Marlin, a Career Education Corporation holding company, has advertised, marketed, distributed, or sold educational products and services to consumers throughout the United States.

8.      Defendant Colorado Technical University, Inc. ("CTU") is a Colorado corporation and wholly owned subsidiary of Marlin with its principal place of business at 231 N. Martingale Road, Schaumburg, Illinois.  At all times material to this Complaint, acting alone or in concert with others, CTU has advertised, marketed, distributed, or sold educational products and services to consumers throughout the United States.

9.      Defendant Colorado Tech., Inc.  ("CT") is a Delaware corporation and wholly owned subsidiary of CTU with its principal place of business at 231 N. Martingale Road, Schaumburg, Illinois.  At all times material to this Complaint, acting alone or in concert with others, CT has advertised, marketed, distributed, or sold educational products and services to consumers throughout the United States.

**COMMON ENTERPRISE**

10.      At all times material to this Complaint, Defendants Career Education Corporation; American InterContinental University, Inc.; AIU Online, LLC; Marlin Acquisition Corp.; Colorado Technical University, Inc.; and Colorado Tech., Inc.  have operated as a common enterprise while engaging in the deceptive and abusive acts and practices alleged below.  CEC has conducted the business practices described below through an interrelated network of companies that have common ownership, business

4

functions, employees, and office locations. Because these Defendants have operated as a common enterprise, they are jointly and severally liable for the acts and practices alleged below. Hereinafter, this complaint refers to all Defendants collectively as CEC.

## COMMERCE

11.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act.

## DEFENDANTS' BUSINESS ACTIVITIES

12.     Since at least 2012, Defendants have used an illegal and deceptive telemarketing scheme to lure consumers to their post-secondary and vocational schools. Defendants, acting through lead generators, have deceived consumers into divulging their contact information under the guise of providing services unrelated to post-secondary education. For instance, some of Defendants' lead generators have posed online as official U.S. military recruiters or as job-finding services and then called consumers whose contact information was solicited under false pretenses. Further, on numerous calls, Defendants' lead generators have continued the deception by misrepresenting that the U.S. military or an independent education advisor recommends the CEC school being marketed. Three such lead generators have been the subject of FTC law enforcement actions in connection with their lead generation activities on behalf of CEC.

13.     CEC has purchased consumer leads from such lead generators, and its in-house telemarketers have called those consumers to pitch its schools, regardless of whether they had placed their telephone numbers on the National Do Not Call Registry. Some such consumers have expressed no interest in college or CEC schools, while others have expressed interest in CEC schools under the false impression that the military, an independent education advisor, or an employer recommended or endorsed CEC schools.

14.     Such consumers then have received a sales pitch urging them to attend a CEC school from a CEC telemarketer who must meet a monthly enrollment quota or face termination. CEC telemarketers have used high-pressure sales tactics to persuade consumers to enroll.

### Overview of Defendants' Business

15.     Since 2012, CEC has operated the following post-secondary and vocational schools:   Colorado Technical University, American InterContinental University, Briarcliff College, Brooks Institute, Brown College, Collins College, International Academy of Design & Technology, Harrington College of Design, Le Cordon Bleu College of Culinary Arts, Missouri College, Sanford-Brown College, and Sanford-Brown Institute. Currently, approximately 35,000 students are enrolled at CEC schools. Only CTU and AIU continue to enroll new students.

16.     CEC has had campuses in over twenty states, including Colorado, Georgia, Illinois, and Texas. In addition to the physical campuses, CEC has operated

6

schools that offer online tuition programs. As of 2018, over 92% of students attend classes exclusively online.

17. CEC schools have accepted federal and military financial aid. The total tuition cost for a bachelor's degree has ranged from $54,360 to $60,450.

### CEC's Marketing and Admissions

18. Career Education Corporation centrally controls numerous functions for its various schools, including compliance, marketing, admissions, and financial aid. CEC negotiates, purchases, and oversees advertising and marketing for all of its schools. Virtually all in-house telemarketers for CEC schools operate from CEC headquarters using a centralized computer system, call scripts, and compliance guidelines created by CEC.

19. CEC has advertised and marketed its schools using a variety of different media, including radio, television, internet, direct mail, social media, and print. Some of its direct advertisements have focused on specific program offerings or have targeted certain demographics, such as military consumers or Spanish-speaking consumers.

20. CEC has engaged in telemarketing to sell enrollments in its schools. Its in-house telemarketers have made outbound calls to consumers identified through different channels, including consumers whose contact information CEC has purchased from lead generators.

7

**CEC Lead Generators Procure Consumer Information through Deception**

21.     CEC has hired lead generators to induce consumers to provide their
contact and other information, which CEC then has used to telemarket its schools and sell
enrollments to consumers.  CEC has used over 70 different lead generators, many of
which have obtained the consumer leads that they have sold to CEC from yet other lead
generators.

22.     Numerous lead generators acting on behalf of CEC have used deceptive
websites and advertisements.  In fact, numerous such websites and advertisements have
induced consumers to submit their contact and other personal information under the guise
of providing consumers with completely unrelated services such as military recruitment,
assistance with job searches and applications and government benefits.  These websites
have not sought consent for CEC or its lead generators to call consumers, nor disclosed
that the purpose of any call would be to market post-secondary or vocational education.

23.     Numerous lead generators acting on behalf of CEC have telemarketed
CEC schools.

24.     The United States Department of Justice, based on a referral from the
FTC, sued CEC lead generators Sun Key Publishing, LLC and Fanmail.com, LLC, and

their principals and related companies (collectively, "SKFM").[1]  The FTC sued CEC lead

generator Expand, Inc., its principal, and related companies (collectively, "Expand"),[2]

and the FTC sued CEC lead generator Edutrek, L.L.C., its principals, and related

companies ("Edutrek").[3]  Below are some examples of the deceptive and illegal tactics

used by CEC's lead generators in these cases.

25.     CEC has marketed its schools by calling consumer leads generated by

SKFM.  Since at least 2010, SKFM targeted consumers interested in military service by

operating numerous websites that posed as official recruiting websites, including

army.com, armyreserves.com, air-force.com, armyenlist.com, airforceenlist.com,

marinesenlist.com, nationalguardenlist.com, and navyenlist.com.  To drive traffic to their

websites, SKFM used internet search engine ads that made no mention of education and

contained phrases such as, "Join the U.S. Air Force" and "The Army Wants You!"

26.     SKFM's websites appeared to be official military recruitment sites.  The

following was an example of an SKFM webpage:

---

[1] *U.S. v. Sun Key*, Case 3:18-cv-01444-HNJ (N.D. Ala. Sept. 6, 2018).  The telemarketers
in this case were employed by Sun Key Publishing, LLC and its related companies.  For
ease of reference, the Complaint refers to them as "SKFM telemarketers."

[2] *FTC v. Expand, Inc.*, 6:16-cv-00714-CEM-TBS (M.D. Fla. Apr. 27, 2016).

[3] *U.S. v. Day Pacer LLC*, 1:19-cv-01984 (N.D. Ill. Mar. 22, 2019).



27.     In reality, SKFM did not have an official relationship with the military. The websites urged consumers to submit their information to "Contact a Recruiter" or "Get Information About Joining" and represented that their "personal information will not be shared with anyone else."  In fact, SKFM shared consumer information with CEC and other postsecondary schools.  SKFM websites did not disclose that their purpose was to collect consumer information to be sold as leads for schools including CEC.

28.    CEC also has marketed its schools by calling consumer leads generated by Expand.  Expand, from at least 2012 to 2016, targeted consumers looking for jobs and lured them into submitting personal information by misrepresenting that it could assist them in applying for jobs, claiming that it pre-screened consumers on behalf of specific prospective employers.  Its "job postings" made no mention of post-secondary education or specific schools.

29.    The following is an example of an Expand job post:



30.    In reality, many of the jobs Expand advertised were not current job opportunities, and Expand was not authorized by the prospective employers to collect

applications, screen applicants, or interview them, and did not pass along any consumer information to the advertised prospective employers.

31. CEC also has marketed its schools by calling leads generated by Edutrek. Edutrek has generated leads originated from websites that claim to help consumers apply for jobs, health insurance, unemployment benefits, Medicaid coverage, or other forms of public assistance (collectively, "job and benefits websites"). These websites have directed consumers to complete an online form by entering their personal information, including their phone numbers. The websites have not clearly informed consumers that their personal information may be sold or used to market training or education programs.

32.     The following is an example of one such job and benefits website:



33.     In reality, the job and benefits websites' primary purpose has been to collect consumer information for marketing purposes.  The websites have created the false appearance that they have obtained consumers' consent to receive telemarketing calls.  For example, Edutrek obtained leads from the website depicted above, which prominently displayed the headline "Jobs In Your Area" and claimed that "Thousands of

13

Government Jobs In Your Area Are Looking to Hire Immediately." Immediately below the submit button, the official seals of several federal government agencies appear, further reinforcing the impression that consumers could obtain information about "Thousands of Government Jobs" by entering their contact information. In fact, Edutrek was not helping consumers find jobs. Instead, Edutrek called consumers to market CEC schools.

34. During that time, CEC received, and had the power to review, the marketing materials that its lead generators used to lure consumers into providing personal information. CEC also had the ability to revise, reject, or opt out of the use of those marketing materials. After reviewing SKFM's websites, CEC directed SKFM to implement certain changes. For example, CEC had SKFM change specific disclosure language on their websites. Yet CEC did not require changes to misleading military related imagery and content on those same websites, including the representation on army.com to "Be More. Join or reenlist today" next to where consumers entered their personal information. CEC also reviewed and approved SKFM's telemarketing scripts, which directed its telemarketers to decrease the number of hang-ups by "[e]mphasiz[ing] the name of the branch and giv[ing] a brief pause during the phrase delivery, 'Hello, this is **NAVY**… Enlist calling for John.'" The CEC-approved scripts also instructed SKFM telemarketers to identify themselves in their voicemail greeting as working at "Military Verification Services." CEC continued its relationship with SKFM even though it

continued to pose as the military and deceive consumers interested in joining the military in order to obtain leads for CEC.

**CEC Lead Generators' Deception Continues During Telemarketing Calls**

35.     During calls with consumers who submitted contact information online, Defendants' lead generators often continue to deceive consumers about their identities or the purpose of the call.  As part of their pitch, some of Defendants' lead generators also misleadingly introduce the topic of post-secondary education and make false claims about CEC schools to get consumers' consent to be contacted by CEC.  Below are some examples of CEC lead generators' deceptive telemarketing claims.

36.     SKFM telemarketers reinforced misrepresentations on their websites that they either were, or were affiliated with, the military.  They told consumers that they were calling "in regard to information requested on the military."  Training materials also directed sales representatives, in order to "decrease the number of HANG-UPS," to "[e]mphasize the name of the branch and give a brief pause during the phrase delivery. 'Hello, this is **NAVY**… Enlist calling for John.'"

37.     During the calls, SKFM telemarketers, posing as military representatives, verified the information that the consumer submitted, and advised that the "military supports earning a degree while serving in the military."  If the consumer expressed interest in receiving information on "military friendly colleges," SKFM telemarketers

recommended up to two post-secondary schools that agreed to pay for Defendants' education marketing leads, including CEC schools.

38.    If the consumer expressed interest in a CEC school after being told it was a military friendly college, SKFM sold the consumer's contact information to CEC as a marketing lead.  CEC then contacted the consumer directly.

39.    Expand telemarketers called consumers who submitted their information on its websites for an "interview."  During such "interviews," consumers were transferred to "independent" education advisors helping consumers find the "best" option to continue their education.  For instance, Expand's "independent" education advisors would tell consumers, "I just want to make sure you know I'm an independent education advisor and that I do not work for any schools or enroll students."

40.    In reality, the independent education advisors only recommended schools, including CEC schools, that hired Expand to generate leads.

41.    If the consumer expressed interest in a CEC school after an "independent" advisor recommendation, Expand sold the consumer's contact information to CEC as a marketing lead.  CEC then contacted the consumer directly.

42.    Edutrek telemarketers have made vocational and post-secondary education pitches during telemarketing calls over consumers' objections.  Its telemarketers have made outbound calls to consumers and have also received transfer calls from other lead generators.  Edutrek has provided call representatives with a script that instructs them to

continue marketing even if a consumer denies having requested information or having any interest in vocational and post-secondary education programs. Edutrek has also trained its representatives to extract further information from consumers who are not interested in post-secondary education, going as far as to award representatives prizes for completing their sales pitch over consumer objections.

43.     If the consumer has expressed interest in a school, Edutrek has sold the consumer's contact information to CEC as a marketing lead. CEC then has contacted the consumer directly.

## CEC Lead Generators Call Numbers on the National Do Not Call Registry

44.     In numerous instances, CEC lead generators have called numbers listed on the National Do Not Call Registry to pitch CEC schools or to facilitate contact between CEC and the consumer who has submitted the number.

45.     CEC lead generators have called consumers who have not consented to be contacted by the lead generator or to be called about post-secondary education or CEC schools, but rather, have submitted their information to be contacted about joining the military, jobs, government benefits, or for other purposes.

46.     CEC lead generator SKFM initiated hundreds of thousands of calls to numbers on the National Do Not Call Registry to market CEC schools without having obtained consumers' express written agreement to receive calls made on behalf of CEC.

47. CEC lead generator Edutrek has initiated millions of outbound telemarketing calls to phone numbers on the National Do Not Call Registry to market CEC schools without having obtained consumers' express written agreement to receive calls made on behalf of CEC.

48. CEC and Edutrek have a history of calling consumers without express written consent. In 2016, both were sued for placing marketing calls to consumers who did not consent to receive such calls. _Fitzhenry v. Career Educ. Corp._, No. 14-CV-10172, 2016 WL 792312, at *1 (N.D. Ill. Mar. 1, 2016); _Mauer v. Am. Intercontinental Univ., Inc._, No. 16 C 1473, 2016 WL 4651395, at *1 (N.D. Ill. Sept. 7, 2016).

49. In numerous instances, both SKFM and Edutrek have made telemarketing calls to consumers even though consumers did not have a pre-existing business relationship with CEC.

## CEC Had Authority to Control Its Lead Generators and Was On Notice of Their Practices

50. CEC has authority over its lead generators. Pursuant to CEC's standard lead purchase agreement, lead generators selling consumers' contact information to CEC must submit all materials that they use to generate leads to CEC, such as websites and advertisements, and allow CEC to edit, revise, reject, or opt out of the use of those materials. The agreement also prohibits use of any telephone scripts without CEC's prior written approval.

51. CEC does not review its lead generators' marketing materials, including telephone scripts and websites, before hiring them to generate leads on its behalf. It has not changed this practice even after it has been on notice that its lead generators are engaging in illegal conduct to procure leads for CEC.

52. CEC was aware that an affiliation with the military was being used by lead generators to induce consumers to consent to be contacted. CEC reviewed a SKFM telemarketing script that directed SKFM telemarketers to feign affiliation with military, yet did not require changes to the script. Consumers expressed to CEC telemarketers that they believed that the military recommended a CEC school.

53. In numerous instances, CEC has continued to accept leads from lead generators despite determining that the lead generator used marketing materials, whether directly or through another lead generator, that did not comply with prohibitions in its lead purchase agreement against deception. For example, CEC used lead generators that deceived consumers into providing their personal information.

54. In numerous instances, consumers have expressed confusion to CEC telemarketers as to why they were being contacted by CEC about college. In fact, CEC training materials anticipate that the consumers telemarketers call may not be interested in school at this time. Despite this, CEC continued to use the same lead generators to market CEC schools.

19

55.     In addition to the FTC enforcement actions discussed above, there were several other actions against CEC lead generators, and an action against CEC itself, alleging deception in procuring consumer information or illegal calls to numbers on the National Do Not Call Registry.  For example, CEC lead generator QuinStreet entered into an assurance of voluntary compliance in 2012 with 30 state attorneys general stemming from its use of deceptive military-themed websites, including GIBill.com, that misrepresented that the military recommended schools, including CEC schools.  After QuinStreet entered into the assurance of voluntary compliance, CEC continued to use lead generators, such as SKFM, that engaged in similar practices.

56.     As discussed above, the FTC and DOJ have brought enforcement actions against three CEC lead generators.  Yet CEC has not changed its practices with respect to Edutrek and other lead generators that were not obtaining consent for calls to consumers from CEC.

**Illegal Telemarketing Practices by CEC's In-House Telemarketers**

57.     CEC has placed over one million outbound calls to numbers on the National Do Not Call Registry derived from CEC's lead generators.

58.     CEC telemarketers have placed outbound telemarketing calls to consumers to sell enrollments.  CEC policy has permitted its telemarketers to call the same consumer up to six times per day and to continue calling until the consumer requests not to be

20

contacted anymore. In numerous instances, CEC has placed hundreds of outbound auto-dialed calls to a single number.

59. CEC telemarketers have worked in a high-pressure call center environment and must meet a monthly quota of enrollments or face termination. If the school does not offer a program of study in which the consumer is interested, CEC telemarketers have encouraged the consumer to sign up for a program that the school offers. CEC telemarketers have used rebuttal scripts to address specific concerns consumers express, including that the consumer had misgivings about whether it was an appropriate time to attend college.

60. An enrollment counts towards a CEC telemarketer's monthly enrollment quota only if the student remains enrolled past the drop/add period, during which they can cancel enrollment without penalty. CEC telemarketers have made numerous calls to consumers who have enrolled up through the drop/add period to dissuade them from cancelling, and would call them up to six times per day during the drop/add period to ensure that they did not cancel enrollment.

61. Based on Defendants' long history of continuous conduct of the type described above; Defendants' continued use of the practices challenged above after learning of the Commission's investigation; Defendants' continued use of lead generators and telemarketing; and the ease with which Defendants can engage in similar conduct,

the Federal Trade Commission has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

## VIOLATION OF THE FTC ACT

62.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

63.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## COUNT I

64.     In numerous instances, in connection with advertising, marketing, promotion, offering for sale, or sale of post-secondary education programs, Defendants through lead generators acting on their behalf and for their benefit, have represented, expressly or by implication, that:

      a.     the lead generators are, represent, or are affiliated with the United States Military;

      b.     the United States Military recommends or endorses their post-secondary schools;

      c.     the information the lead generators have collected from consumers will be provided to the United States Military for recruitment purposes and will not be shared with anyone else;

d.      by submitting information, or by participating in a purported interview, consumers have applied or are applying for an open job position;

e.      representatives are acting on behalf of prospective employers hiring for open job positions; and

f.      independent education advisors recommend or endorse their post-secondary schools.

65.      The representations set forth in Paragraph 63 are false and misleading.

66.       Therefore, Defendants' representations as set forth in Paragraph 63 of this Complaint constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

67.      Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter.  16 C.F.R. Part 310.

68.      Among other things, the 2003 amendments to the TSR established a do-not-call registry, maintained by the FTC (the "National Do Not Call Registry"), of consumers who do not wish to receive certain types of telemarketing calls.  Consumers can register their telephone numbers on the National Do Not Call Registry without charge either through a toll-free telephone call or over the Internet at donotcall.gov.

23

69.     Consumers who receive telemarketing calls to their registered numbers can complain of National Do Not Call Registry violations the same way they registered, through a toll-free telephone call or over the Internet at donotcall.gov, or by otherwise contacting law enforcement authorities.

70.     The FTC allows sellers, telemarketers, and other permitted organizations to access the National Do Not Call Registry over the Internet at telemarketing.donotcall.gov, to pay the fee(s) if required, and to download the numbers not to call.

71.     Under the TSR, a "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor. 16 C.F.R. § 310.2(ff).  A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration.  *Id*. § 310.2(dd).

72.     Under the TSR, an "outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution.  16 C.F.R. § 310.2(x).

73.     The TSR prohibits sellers and telemarketers from initiating an outbound telephone call to numbers on the National Do Not Call Registry unless the seller (1) has obtained the consumer's express agreement, in writing, to place such calls, or (2) has an established business relationship with that consumer, and the consumer has not stated that

24

he or she does not wish to receive such calls.  16 C.F.R. §§ 310.2(q), 310.4(b)(1)(iii)(B). Valid written consent to receive a live telemarketing call to a number on the National Do Not Call Registry requires:  (i) a writing signed by the consumer, (ii) clearly evidencing authorization to receive calls placed on behalf of a specific seller, and (iii) stating the phone number to which such calls may be placed.  16 C.F.R. § 310.4(b)(1)(iii)(B)(1).

74.    The TSR prohibits sellers and telemarketers from repeatedly or continuously calling a number with the intent to annoy, harass, or abuse any person at the called number.  16 C.F.R. § 310.4(b)(1)(i).

75.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Defendants Violated the Do Not Call Provisions of the TSR**

76.    Defendants are "sellers" and "telemarketers" who, in connection with "telemarketing," as those terms are defined in the TSR, sell post-secondary educational services.

77.    Defendants are also sellers and telemarketers that initiate or cause others to initiate outbound telephone calls to consumers in the United States to induce the purchase of their post-secondary educational services.

25

78.     Defendants have engaged in telemarketing by a plan, program, or campaign conducted to induce the purchase of post-secondary educational services by the use of one or more telephones and which involves more than one interstate telephone call.

79.     Defendants cause lead generators to call consumers to induce the purchase of post-secondary educational services.

80.     Defendants buy leads from lead generators where the lead generators represent that the leads have given their permission to be called about post-secondary educational services.  Defendants then call the leads to induce the purchase of their post-secondary educational services.

81.     Defendants made no efforts to prevent their live telemarketing calls from being placed to telephone numbers on the National Do Not Call Registry.

82.     Consequently, Defendants made hundreds of thousands of calls to telephone numbers on the National Do Not Call Registry.

83.     Consumers whose telephone numbers were on the National Do Not Call Registry and who received Defendants' live telemarketing calls did not have a pre-existing business relationship with Defendants nor had they given express written consent to receive telemarketing calls specifically from Defendants or their lead generators.

## COUNT II

84.     In numerous instances, in connection with telemarketing, Defendants directly or through their lead generators, have initiated or caused others to initiate an outbound telephone call to a person's telephone number on the National Do Not Call Registry in violation of the TSR. 16 C.F.R. § 310.4(b)(1)(iii)(B).

## COUNT III

85.     In numerous instances, in connection with telemarketing, Defendants directly or through their lead generators, have misrepresented, expressly or by implication, that:

a.     the lead generators are, represent, or are affiliated with the United States Military;

b.     the United States Military recommends or endorses their post-secondary schools;

c.     the information the lead generators have collected from consumers will be provided to the United States Military for recruitment purposes and will not be shared with anyone else;

d.     by submitting information, or by participating in a purported interview, consumers have applied or are applying for an open job position;

e.     representatives are acting on behalf of prospective employers hiring for open job positions; and

27

f.      independent education advisors recommend or endorse their post-secondary schools.

86.     Defendants' practice as alleged in Paragraph 84 of this Complaint is a deceptive telemarketing practice that violates the TSR, 16 C.F.R. §§ 310.3(a)(2)(vii) & (a)(4).

## COUNT IV

87.     In numerous instances in connection with telemarketing, Defendants have provided substantial assistance or support to one or more lead generators even though Defendants knew or consciously avoided knowing that one or more such lead generators were engaged in violations of § 310.4 of the TSR.  Defendants, therefore, have violated 16 C.F.R. § 310.3(b).

## COUNT V

88.     In numerous instances, in connection with telemarketing, Defendants have initiated repeated and continuous outbound telemarketing calls to telephone numbers with the intent to annoy, abuse, or harass the person at the called number.  16 C.F.R. § 310.4(b)(1)(i).

## CONSUMER INJURY

89.     Consumers in the United States have suffered and will suffer injury as a result of Defendants' violations of the FTC Act and the TSR.  Absent injunctive relief by

this Court, Defendants are likely to continue to injure consumers and harm the public interest.

### **THIS COURT'S POWER TO GRANT RELIEF**

90.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and other ancillary relief to prevent and remedy any violation of any provision of law enforced by the FTC.

91.     Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, and as implemented by 16 C.F.R. § 1.98(d), authorizes this Court to award monetary civil penalties of up to $41,484 for each violation of the TSR, 16 C.F.R. § 1.98(d).  Defendants' violations of the TSR were committed with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

92.     This Court, in the exercise of its equitable jurisdiction, may award ancillary relief to remedy injury caused by Defendants' violations of the TSR and the FTC Act.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests that this Court, as authorized by Sections 5(a), 5(m)(1)(A), and 13(b) of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), and pursuant to its own equitable powers:

A.      Enter judgment against Defendants and in favor of Plaintiff for each violation alleged in this complaint;

B.      Award Plaintiff monetary civil penalties from each Defendant for every violation of the TSR;

C.      Enter a permanent injunction to prevent future violations of the TSR and the FTC Act by Defendants;

D.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

E.      Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Dated: August 27, 2019

LEAH FRAZIER
QUINN MARTIN
Federal Trade Commission
600 Pennsylvania Ave., NW
Mail Drop CC-10232
Washington, DC 20580
(202) 326-2187; (202) 326-2080
(202) 326-3768 (facsimile)
lfrazier@ftc.gov; qmartin@ftc.gov

ELIZABETH C. SCOTT, Local Counsel
Federal Trade Commission
230 S. Dearborn Street, Suite 3030
Chicago, Illinois  60604
(312) 960-5609
(312) 960-5600 (facsimile)
escott@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

31